I want to thank everyone for the patience and indulgence that we've had in scheduling this case. It's not been that easy, but we're here now, so hopefully we can move it on. This is Woodford Portfolio v. NLRB. Mr. Morio?  May it please the court, John Romeo of the Gibbons firm on behalf of Petitioner Newark Portfolio. I'd like to request three minutes for rebuttal. Okay. This case involves a union election that denied employees a free and fair election for any of three reasons. Number one, there was an anti-Semitic slur shouted at one of the voters as he entered the building to vote. As bad as that is, and it's bad, how can you say that's enough in light of the Stray Remark Doctrine? Well, the Stray Remark Doctrine, are you referring to the Sewell case? Yes. The Sewell case actually, I believe, doesn't stand for that. This court in Silverman outright rejected the concept that Sewell will not allow a single isolated comment to be sufficient to overturn an election. Our Silverman's case made clear that a single ethnic remark or racial slur, as I think was the case there, may be enough. But that case wasn't even cited in the adjudication by the hearing officer, was it? Shockingly and surprisingly, it was not cited. The hearing officer actually took the exact same position as the board does here that the board took in the Silverman case. The problem with Silverman was there wasn't even a hearing to require the union to prove, to satisfy its burden. Here you have, in the whole opinion, it's not about the merits of the case, but whether or not enough has shortly been made to justify a hearing. And the problem there was the fact that there was no hearing and you don't have that here. Well, I think the concept of a hearing, and that is what the NLRB bases their argument on, but I think that the fact that Silverman's required a hearing is a little bit of a misnomer here because here's what Silverman says. What Silverman says is, hey, board, you can't just not have a hearing and say that this comment wasn't enough because it's a single remark. We're telling you right now a single remark is enough, so you have to have a hearing. And what the board did here, they just turned it upside down. They said we're going to have a hearing, and then they say in their report, in their decision, we had our hearing, and because it was a single remark, it's not enough. Well, they just turned it outside down. Silverman says a single remark is enough, so you have to have a hearing. And here they said we had a hearing, it's just a single remark, so it's not enough. Let me bring something to your attention that I will be actually more interested in hearing from the NLRB than you. But put aside Silverman, look at the opinion at the first stage in this case. And we're, of course, in an appellate review mode where we owe substantial deference to findings of fact made, and this hearing officer made findings of fact and, in fact, made credibility determinations that were to a great extent favorable to witnesses that your client offered. Absolutely. But interestingly, there was no finding of fact made with respect to the racial slur. It seemed that it was carefully referred to as assuming that, and then the board did the same thing. And I would really like to hear what difference anybody thinks that made. Are we still dealing with finding of fact? Was the NLRB just trying to be cute about that? Yeah, I'm guessing that they were trying to be cute to some extent, but from our perspective, if you read the credibility determinations that she made, that the board made, they believe Mr. Filbert. They don't believe the three union representatives who they did not find to be credible at the hearing. Mr. Filbert testified that the remark was made. Two of the three or all three of the union representatives that are not credible and that their testimony is going to be discarded to the extent it's inconsistent with, among others, Mr. Filbert's, said that they didn't hear the remark. Well, first, not hearing the remark doesn't mean it wasn't made. It just means it wasn't made in your presence. But secondarily, they believe Mr. Filbert. And then they continued with their discussion, assuming that the remark was made. So we're of the perspective that the substantial record evidence is that the remark was made. Included that as a finding. And included that as a finding of fact. That's the approach that we're taking with respect to that. That's what we believe that the hearing examiner decided in the board. And what was the finding of fact about electioneering? The finding of fact about electioneering was that the board agent did not make a determination or did not make the directive to the parties that they should not electioneer in front of the building. And how is that wrong? Because the very clear testimony, the testimony of Mr. Escobar. But Mr. Escobar's testimony was not all that credible. Well, Mr. Escobar's testimony was not credible to the extent that it was inconsistent with any other testimony. They were very clear on that point. And didn't they also say it was internally inconsistent? Or it was internally inconsistent. But his testimony is neither internally inconsistent nor is it contradicted by anybody else's testimony. And therefore his testimony is credited. So you're getting the testimony. Where does that therefore come from? When you have somebody whose testimony is internally consistent and you still just don't believe the person. It can be their whole lives that we engage in about body language and how someone testifies. I would submit on that point that if the board wanted to say we're discarding Mr. Escobar's testimony because we don't believe him, they would have said that. What they said quite clearly was we don't find him credible to the extent that his testimony is either inconsistent internally or contradicted by somebody else. Because his testimony was not inconsistent internally or contradicted by anybody else, the opposite is true that they did accept his testimony. They would have said we're discarding his testimony entirely because we don't find him credible. They could have said that. They did not say that. They limited the extent to which they didn't find him credible. So what did he say? What was consistent with your witnesses? What Mr. Escobar said is that during the pre-election hearing, the board agent made a statement that nobody, neither party, not the union and not the employer, is to have their representatives actually electioneering out in front of the building. Building or polling place? Excuse me? Building or polling place? Building. She said building. Where can you cite that in the record? At joint exhibit 479, I believe. So once that statement is made, at the outset, backing up a second, board law is very clear that we're supposed to give great deference to that board agent. They're the ones at the building. They see what's going on. They see the circumstances surrounding the election, and they make the decisions as to where somebody should or should not electioneer. And if you think about it in this case, the facts, I mean, this was an election with ten voters. Ten voters. It's a small environment, obviously. It's a small environment, but so take a small environment. It's a residential environment. It's in an apartment building. So it's a small residential environment, and all of a sudden in the very front of this apartment building, there are upwards of 40 folks loudly electioneering, yelling at people as they walk in and out of the building, and lining up on the steps forming almost a gauntlet on the steps as you walk into the hallway of the apartment building. And once you're in that hallway, you walk down to the polling place. Can you point us to any cases that make an issue of the number of union representatives or members who show up in an electioneering place or make an issue of the ratio as between the number of union spectators, if you will, versus the number of potential collective bargaining unit members? I don't have a case to cite you to on that particular point. And that's frankly not the point I was trying to make. I was trying to paint the picture of the environment that the board agent would have walked through when she walked in to conduct the election. And after walking through that environment is when she sat down and said, yes, nobody, not the union, not the employer, should electioneer in front of this building. So presumably because it's too coercive an environment because of the locus of the election? I can't imagine another reason why the board agent would say don't electioneer in that area. Because it's not unheard of that there would be electioneering before union elections, right? No, it's not. It's common. It's common. So here it had to be prohibited because of the neighborhood or the size of the buildings and the number of voters? At the end of the day, the goal is to ensure that the employees have an opportunity to vote in a fair and free election. And the board makes decisions as to whether that's going to happen. When that board agent saw that situation, I'm sure it was in her mind that having those folks have to walk through that gauntlet on their way into the building is not letting their minds be free of intimidation and what else as they're going in to vote. One of the voters said, I think from the minute he went in the front door, it was about 10 to 15 seconds until he actually went in the voting room and cast his ballot. I asked you whether it was the polling place or the building. The question you asked was there should be no electioneering taking place out in front of the building. Exactly. And the answer was that's correct. Exactly. And that's exactly where the electioneering took place, including the anti-Semitic comment that was made took place out in front of the building. So are you saying that this should be an automatic reversal, that there has to be a new election because the board could not on remand conclude that this was a fair election in spite of the electioneering? I think that's the case. I think that's the case with respect to the no electioneering because the board, under the Miltrum rule, it's a very strict rule. If you electioneer, if you talk to voters in an area that is either the polling place, as may be extended by a no electioneering zone, or a waiting in line to vote, then it's a very strict rule outside of the minimus conversation that the election gets set aside. Well, but here we say the polling place. In Miltrum, they said either the polling place here, the saloon room, or in line to get into the polling place. Yes, but if you look at Biomed, the Biomed case. That was a room right next door 30 feet away. That's different than here. But it was not the polling place. It was a room that was added as a no electioneering zone by the board agent before that election. Within 30 feet of the polling place. Excuse me? Within 30 feet of the polling place. It was probably, I think it was within 30 feet of the polling place, but that's to the board agent's discretion as to what they're going to say in that regard or not. And in that case, they said it was the waiting room. And in this case, they said out in front of the building. What if the board agent allowed the, what if the board agent here had gone out and admonished and ejected the woman that made the anti-Semitic remark, but then said, you know, look, behave yourselves, keep it civil, and, you know, continue electioneering? If the board agent said that? Yeah. I would be surprised if she said not to electioneer in that area. But if she did, that could have changed things. But I would think that would be consistent with her earlier. So then the reason I ask you the hypothetical is, is the problem here not the electioneering, qua electioneering, is the problem here that the electioneering occurred in spite of the agent's determination that it should not happen? Yes, because then that's a distinction between a lot of the cases cited by the board here. The board cites a lot of cases, including Bally's, which is what the board relies on, to say that out in front of the building is not at or near the polls. The distinction between most of those cases, if not all, and our cases, our case like Biomed, had at or near the polls to include a no electioneering zone as set forth by the board agent at the election. So really, the waiting room in Biomed and out in front of the building in Newark, Parvoli are the same place for purposes of determining whether electioneering is proper there. And the electioneering that occurred here was sizably worse than the electioneering that occurred in that case. Which case, Biomed? Excuse me? Which case, Biomed? Biomed, yeah. Thank you, Mr. Murray. You served some time. Yes, thank you very much. Ms. Collins? May it please the court. Good afternoon. My name is Valerie Collins, and I represent the National Labor Relations Board. I wanted to quickly address factual concerns with the company's argument about the electioneering, and then I wanted to address some of the legal concerns. that the company has made about the anti-Semitic remark. Factually, I want to be crystal clear. The board agent here did not designate the front of the building as a no electioneering zone. The testimony that the company relies on, as you noted, is discredited to the extent that it conflicts with credited testimony. And that is exactly what we have here. There is credited testimony that is on point. It appears specifically on Joint Appendix page 233. Whose testimony is that at 479? Is that Escobar? 479 is Escobar. It was generally discredited, but it was couched in terms of not generally discredited, don't believe anything, generally discredited when it conflicts with accredited witness. And here we have accredited witness, Mr. Jimenez, and when the attorney asked the question during the hearing, question, did the board agent talk about the front of the building? And this is all about the electioneering. Can you give me the page again? I'm sorry, Joint Appendix 233. And this was a topic about did the agent say anything about the people in the front of the building? And he answers quite clearly, no, because she didn't talk about it, That is a conflict. I mean, that's kind of the very, the most basic conflict that you can get. And because we have credited testimony that conflicts with Escobar on this point, the hearing officer properly credited this. This is the fact that the board was working with. And in any event, it's a little too late for the company to make the argument, oh, well, Escobar should have been credited over Jimenez. They didn't assert that argument before the board because it wasn't an issue. It was very clear. And the board hinged a lot of its opinion on the fact that there were no special instructions. And because there were no special instructions, that's where Bally's Park comes in. Because Bally's Park, which the board relied on, says that when a board agent says there's kind of a general no electioneering zone, or sometimes there's even a sign that says in the polling place no electioneering, the board interprets that kind of general language of encompassing in or around the polling place. And here we have a very concrete finding from the hearing officer that the front of the building was 100 feet away. I'm sorry, are you talking about Jimenez? Yes. I'm going to quote from the transcript, the appendix at 249, 250. Yes. The question was asked, I want to go back to that pre-election conference. You said before, okay, isn't it true that during that conference the board agent told everybody that there shouldn't be no electioneering. Answer, there shouldn't. Question, no electioneering. There should be no electioneering. Answer, there was no longer to be no election. Question, no electioneering. No campaigning. Answer, she says something like that. I think she said it. Yes. So that's Jimenez admitting that the pre-meeting said no electioneering. Yes, that is true. I know that the record doesn't indicate that anyone said there should be a zone. There was no zone designated. I think Mr. Romeo would even concede that. But when the board agent at the meeting said there should be no electioneering, how could we construe that as anything other than the behavior that was occurring on the sidewalk in front of the building? That, in essence, is Bally's Park. When the board has a general no electioneering, the board does not interpret that language to mean no electioneering ever, wherever, a mile away, point blank. What about in front of? I'm sorry? What about in front of? Forget a mile away forever, but what about no electioneering? That doesn't count. I mean, the Bally's Park says when you have a general language like this, no electioneering, it's no electioneering in the polling place. So as long as it occurred outside the laundry room, it's fine? That's your legal position? Well, that or near. So technically, if it were near the laundry room, it could have extended. The no electioneering could extend to that. But the hearing officer here found in the credited testimony establishes that the front of the building was 100 feet away. I would absolutely direct the court to... But Escobar admitted himself. The question was posed directly to him. Do you recall Ms. Rivas telling everybody in that room, both sides, the union and the employer, that there should be no electioneering taking place out in front of the building? Answer, that's correct. And that's discredited because it conflicts with Mr. Jimenez, who says that she did not say that. Jimenez directly said that nobody said there should be... Yes. At joint appendix 233, the question is, I'm talking about, and this is in reference... I'll go back a couple. So at the bottom of the page, the... Bottom of 233? I'm sorry? Bottom of 233? Yes. Starting at line 17 or 18, they're talking about what the directions about the front of the building. So the answer is, no, she explained it. She said generally, you know, the people can't be in the room. And then the question is, oh, wait, you're talking about the line in the room. And he says, yes. And the question, the attorney says, no, I'm talking about the front of the building. And he responds, no, because she doesn't talk about it. She didn't talk about the front of the building, and that's discredited testimony. All right, but one witness saying there was no mention made of front of the building compared with other witnesses who said they've got their own witnesses who say front of the building, right? Yes. And you've got one of your witnesses saying front of the building, and you've got the finder of fact saying that we're going to credit Escobar to the extent he's not inconsistent with their witnesses. And on the point that we're talking about now about in front of the building, Escobar is perfectly consistent with their witnesses. He might be slightly askew with what you've quoted at 233 from Jimenez, but Escobar is consistent with their witnesses about front of the building. I have to respectfully disagree that that's not a conflict. And it's a little odd here because it wasn't a their witness, union witness. These are actually both union witnesses. So that's a little unusual. But the board took the view that looking at these facts, and the board talks about this in the certification in reviewing the hearing officer's report, that there's no evidence that supports that the agent delineated a no electioneering zone. We've already agreed about the zone. If the case turns on the word zone, you've got to slam dunk him. Even if I don't. I think we're trying to figure out whether or not they were allowed to electioneer in front of the building. Yes. You say they could as long as they weren't in the laundry room or close to the laundry room. Yes. I read a record here in an opinion that credited the witnesses of Newark Portfolio. They found them credible, right? To the extent that the witness was a union witness and he was found. What about their witnesses? Their witnesses were credited, but they don't talk about this. I'm just talking about their witnesses. Okay. All right. So let's use, I mean, Philbert's kind of their main guy, right? All right. Yes. Philbert's credited, right? Yes. He's credible. Okay. So if Philbert is credible and he says that the board agent said no electioneering in front of the building. He didn't say that. He didn't say that. No. Okay. Did any of their witnesses say that? No. The only witness who said that is Escobar. Escobar is their only one. The only one who says that front of the building was, that she said anything about the front of the building. Did Philbert or any of their witnesses say that there was a mention of no electioneering generally? That I'm not 100% sure of. I don't think it was in dispute that she said no electioneering in general. Honestly, regretfully, I just don't know. All right. But then I think I understand your argument better. Your argument is that when Escobar says, when he testifies that there was a comment about no electioneering in front of the building, you don't believe him and the board didn't believe him. Exactly. And can you point to where in the opinion the board said he was lying about that? The board does not say he was lying. Or mistaken. So the hearing officer, her credibility determinations, there is kind of a catch-all footnote that appears on page 25 of the joint appendix, but she also goes through a couple pages of dealing specifically with credibility that begins on page 33 of the joint appendix, where she generally credits all of the company's witnesses, and then she generally credits essentially half, three of the union's witnesses, and then generally discredits three of the union's witnesses, including Escobar, to the extent where it conflicts with a credited witness. And that's on page 34. And she references in the footnote that she took into consideration demeanor and consistency within the testimony. I also would like to point out that the company did not accept to these credibility determinations. So to the point that they're saying the hearing officer messed up in these credibility determinations, the court simply doesn't have jurisdiction to hear that, because it was never raised before the board in the first instance. Just so I can move on just briefly, a couple other factual points I wanted to make about the electioneering. So a lot of the company's argument kind of hinges on this fact that the board agent made this statement that they can't electioneer in the front of the building. The other fact that the company relies on a lot of is kind of relatedly how close. Because even if they say, fine, maybe she didn't say in front of the building, but they were so close that it should have been encompassed in the more general direction, I would like to just highlight to the court that the hearing officer explicitly held that this was 100 feet away. I also would invite the court to look at the picture of the building in question in Joint Appendix 549. And you can see for yourself the distance between the front of the building and the back of the building is way more than just a few steps as the company characterizes it. If there are no more questions about the electioneering, I wanted to touch just briefly on the anti-Semitic remark. Yeah. Could you do it in the context of the electioneering? Because I'm interested in whether you think it makes a difference. For example, if that anti-Semitic remark, well I'm interested in your response to Judge Smith's question about it with the use of the word assumed, which I too found strange. But I guess my question is, was the anti-Semitic mark enough if it was made in the context of electioneering that was prohibited, but not enough if made outside the context of prohibited electioneering? So essentially what the board held here was that it was not enough in either sense. So the board when it reviewed the hearing officer's report says, we looked at this evidence individually, so only if one had happened and not the other, and also cumulatively and decided that in either instance it was not enough to disregard what the employees' votes. I'm turning to kind of the assuming this fact is established. How do you put that in connection with Silverman? So Silverman is key here. The company relies very heavily on Silverman for its position that the board kind of totally messed up here. One of the things that jumped out at me in the reply brief is the company says that the board has a fixation on the procedural posture of Silverman. And I agree, that's totally correct, because it matters. Silverman had to do, the third circuit, this circuit was telling the board, look, you didn't even have an evidentiary hearing. You need to have an evidentiary hearing. What would be the purpose of a hearing? To determine if this one comment rose to the level of being objectionable requiring a second election. And the court remanded that issue to the board. What we said was the company has led the remark. Under that rule, the burden of establishing the legitimacy of the remark shifted to the union. So what we're saying was that without a hearing, this is booting right from the opinion, without a hearing the union was never required to meet the burden. But the burden that we asked the union to meet was the legitimacy of the remark. Now I'm not quite sure how that remark would ever be legitimate, either in Silverman or here. But I agree that the distinction between Silverman in this case is that there was no hearing in Silverman than there was here. But if the purpose of the hearing in Silverman was simply to determine whether or not the remark was made, here it clearly was made, what difference would it make whether or not there's a hearing? I'm not sure I completely understand your question. So Silverman, what the court was saying in Silverman is that there needed to be evidence. The board needed to take evidence. And on remand, the board did just that. And the purpose of the evidence is what? To determine whether the rule in Sewell was violated, to determine whether the election should be discarded. And on remand, the board came to the same conclusion that it should not. And this court enforced that board order. So Silverman simply does not stand for the proposition that whenever you have a single inflammatory remark, there's some type of per se there should be a new election. That's not what Silverman stands for. It was harmless. I'm sorry? You're basically saying the hearing would be to determine whether or not the score was harmless. Yes, it would be whether or not. Essentially, the board would go through that analysis. Here, the board did go through that analysis, and the company just disagrees. I see that my time is up. But it was harmless in part because there was no electioneering violation, right? I'm sorry, in Silverman? Here. Here. Well, I think the board was here. Let me ask it another way. It would seem a lot easier for the board to discount the anti-Semitic remark as a straight remark or not influencing the election if it occurs outside the context of illegal or prohibited electioneering, right? I do think that there would be a stronger argument that it was even more isolated if there was no electioneering. But here what the board determined is essentially zero plus zero equals zero. The electioneering was legit, not legit in terms of everything's perfect, but did not require a new election, and the same with the remark. Certainly it's terrible, but the board simply concluded that it didn't rise to the level that the employee's votes should be discarded. If there are no further questions, I thank the court for your time. Thank you. Mr. Romero, do you have any witnesses on your side that testified that there was a directive that there should be no electioneering in front of the building? There are two witnesses, but neither of which we called, and I think that actually aids our position. Mr. Escobar. Mr. Escobar is a representative of the union who was called by the union to testify who was in that room at the pre-election hearing as a representative agent. Well, but their argument is he's incredible. I think I read what you're just talking about there. He's incredible to the extent that he's inconsistent. I don't know that we got a full and fair reading of Mr. Jimenez's testimony at pages JA-233 and 234. The question was, I'm talking about in front of the building. Where are you now? At the very bottom line, 24 of joint appendix 233. The question was, I'm talking about in front of the building. And he says, no, because she doesn't talk about it. But that's where we've got to continue reading. Flip the page. She just said, the lawyer. The union can't be there. The lawyer can't be there. Those are the folks that were in the pre-election hearing. He said, I'm talking about in front of the building. That was the question. The answer was, the union can't be there. The lawyer cannot be there. So I would say there can refer only to the front of the building. If you look at the question that was asked, the question was, I'm talking about in front of the building. I don't think it could refer to anything else. That's number one. Number two, with respect to Bally's, and I think I mentioned it earlier, but Bally's is very clear that the board agent just said that there can be no election hearing at or near the polls or in the polling area. That is the normal at or near the polls. That's the distinction of Biomed, where the board agent adds an additional no election hearing zone. If you don't mind, if I could spend a little bit of time. Well, Ms. Collins says at or near the polls is, you know, the hallway and inside the building outside the laundry room. Why would that be incorrect? Ms. Collins says that the hallway outside the laundry room would include at or near the polls?  It seems like you're sort of cavalierly assuming that that's at or near the polls, and I think the answer is no, at or near the polls is proximate to the laundry room. I would submit quite the contrary. I'm saying that at or near the polls may or may not be on the hallway outside the laundry room, unless and to the extent the board agent determines that the election hearing zone is broader than that. When the board agent said not out in front of the building, that brought it into the no election hearing zone, which brings it within Meltzer much like the decision in Biomed. Two seconds on the Silverman's case. Number one, that case was sent back, and the determination was not made as to whether it was harmless. The determination was made that the statement was never made. The determination ultimately when it was sent back was that the statement was never made. The key issue, I notice my time is up. Thank you very much. The issue there is that whether or not you have the hearing, the Third Circuit in Silverman said a single remark is enough. If you look at what the board decided in this case, they said yes, we have the hearing. What we said was it may be enough. Excuse me? What we said is it may be enough. Okay, I'm fine with that, but if you look with the decision, if you look at the decision, and it was enough in that case, in that case the word was stingy Jew. In this case it's these Jews don't care about you, just their money. A very similar comment. M&M, similar comment. Carl Weisman, similar comment. One comment in each case, set aside the election in each case. But what I want to point out is the board in their determination, when you read it, it says the, let me get to the right page for you, the sole, the only issue for the board to decide is whether this lawyer was part of a significant sustained aspect of the campaign. And because the statement doesn't rise to a level of a sustained appeal, it's not, it doesn't fall within Sewell. What we've learned from Silverman is that that's not the sole question. That's significantly not the sole question. And when the board only looked at that as the sole question, they ignored the fact that this court in Silverman said we reject that. We're not going to put our voice to that chorus. We're not going to agree with that. When they said that, that's all they were looking at. They applied the wrong standard. And Chief Judge McKee, I think you asked the question about the burden. And it's true. The burden that the board applied here was did it have a tendency to interfere with the election or the free choice of the voters? And if you read Silverman's and Sewell, the burden should have been once the statement was made, and they did find that it was made, put onto the union to show that it was legitimate, that it was truthful or that it was somehow germane. And just like this court did in Silverman's, I don't think there's any way they could have done that in this case. Whether it was harmless. Maybe it's the same thing. Excuse me? Whether it was harmless. Maybe it's the same thing, but I think it's different. Whether it was harmless, it looks like they set it forth somewhat separately in Silverman's, but I believe that must be what they meant looking at all the other cases that have gone down that path. The burden shifts from the employer in this case to the union to prove our comment was truthful and germane. And I think Silverman says a comment like this just can't be. As a matter of law, it can't be. So the board applied the wrong standard looking for the tendency of it impacting the voters and not looking at whether or not the statement which they found to be true was either truthful or germane. I think my time is up unless you have any questions. Thank you very much for coming in.